**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**BRUCE W. GRAHAM**
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| KYLE LYNCH, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )　　No. 79A02-1112-CR-1175 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Randy J. Williams, Judge
Cause No. 79D01-1009-FA-28

**September 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Kyle Lynch appeals his conviction and sentence for child molesting as a class A felony.[1] Lynch raises three issues, which we revise and restate as

I. Whether the trial court's failure to give certain jury instructions requires reversal;

II. Whether the court abused its discretion in admitting statements Lynch provided during a police interview; and

III. Whether Lynch's sentence is inappropriate.

We affirm.

The relevant facts follow. In October 2009, Lynch, who was twenty-two years old, his wife Rachel, their newborn twin children, and Rachel's mother Patricia Cobleigh were living together in Lafayette, Tippecanoe County, Indiana. Rachel's sister, Brittany, had two sons, M.W. and three-year-old L.W. Brittany resided with Tim Copley, who was the father of M.W.

At about 8:00 a.m. on October 13, 2009, Cobleigh left the house to visit her son and babysit her grandson. At about 11:30 a.m. or 12:30 p.m. that day, Rachel called Brittany and stated that she needed a ride to the doctor's office for a follow up appointment. A short time later, Brittany drove to Rachel's house with M.W. and L.W., and L.W. was excited about seeing Lynch. When Brittany arrived, Rachel came outside to the vehicle and helped L.W. out of his car seat, and L.W. ran inside the house to see Lynch, who L.W. "liked [] a lot." Transcript at 77. Brittany, with M.W. and Rachel in the vehicle, drove Rachel to her doctor's office.

---

[1] Ind. Code § 35-42-4-3 (Supp. 2007).

At approximately 1:00 p.m., Cobleigh returned home, opened the patio door, and immediately "heard some scuffling going on upstairs" and "heavy footsteps that were moving quickly." Id. at 14-15. Cobleigh heard L.W. yell "mamaw," which was how he referred to her. Id. at 15. Cobleigh walked to the bottom of the stairs and looked up the stairs. Cobleigh observed L.W. in front of the bathroom door, Lynch kneeling behind L.W. "with a white washrag, dobbing [L.W.] on his rear end." Id. L.W.'s pajama bottoms were about halfway between his knees and his bottom. L.W. was whimpering, crying, and saying his butt hurt. Cobleigh began to walk up the stairs and asked what happened, and Lynch "didn't really answer" and "just said that [L.W.] was bleeding." Id.

Cobleigh observed that L.W. was bleeding from his anus and that "there was something sticking out that was bluish gray and it didn't look right." Id. at 16. Cobleigh told Lynch to go downstairs and obtain diaper cream. Cobleigh called Brittany and told her that she needed to return home because L.W. was injured and needed to be taken to the hospital. L.W. continued to whimper, cry, and say that he was hurting.

After receiving the call from Cobleigh, Rachel and Brittany returned home from the doctor's office. When Brittany arrived, Cobleigh carried L.W., who was screaming and crying, to Brittany's vehicle. Brittany took L.W. to a local hospital, where L.W. was seen by medical personnel who observed that there was blood in L.W.'s rectal area, bruising at the top and bottom of his anus, and active bleeding. A nurse called police and child protective services and obtained L.W.'s underwear, sealed the underwear, and gave it to a detective with the Lafayette Police Department. L.W. was transported by ambulance to Riley Children's Hospital in Indianapolis.

3

After arriving at Riley, L.W. was examined by a sexual assault nurse, who observed that L.W. "was profusely bleeding from his anus," and notified a surgeon to examine L.W. regarding any possible internal injuries. Id. at 152. Dr. Roberta Hibbard, who examined L.W. and also reviewed photographs taken in the pediatric center at Riley, determined that L.W. had sustained traumatic injuries to his anus due to the type and location of certain lacerations and bruising. Dr. Hibbard found that L.W. had sustained "a penetrating injury to his anus." Id. at 334. Dr. Hibbard noted that there were some bruises just below L.W.'s buttocks that could have been consistent with spanking. However, Dr. Hibbard determined that the injuries to L.W.'s anus were not consistent with spanking, were not consistent with superficial fissures that could potentially have come from constipation or a bowel movement, and were not consistent with a typical accidental fall.

During the police investigation, Lynch agreed to go to police headquarters to give a formal statement and gave a statement denying any involvement in molesting L.W. Police also obtained five statements from Copley. In his fifth statement to police, Copley implicated himself in the molestation and was arrested and charged. In addition, the washcloth that Lynch had used to wipe L.W. was collected for DNA analysis and DNA samples were taken from Lynch and Copley. Several months later, the results of certain DNA testing excluded Copley and instead implicated Lynch, and Copley was released from jail. DNA testing revealed that seminal material found on one area of the washcloth and the crotch area of L.W.'s underwear matched the DNA profile of Lynch.

In September 2010, as the charges against Copley which had been filed about eleven months earlier were in the process of being dismissed and as Copley's previously-scheduled trial date was approaching, Lafayette Police detectives contacted Lynch and told him that they needed to talk to him about the upcoming trial and informed him that they wanted to go over some of the results they had received from the lab. On September 23, 2010, Lynch waived his rights and provided a recorded statement in response to police questioning by two police detectives. During the interview, in response to police questioning, Lynch stated that he placed L.W. facedown on the sink in the bathroom, that he unzipped his own pants, that his penis was erect, and that he inserted his penis into L.W.'s anus.

On September 24, 2010, the State charged Lynch with child molesting as a class A felony. On September 28, 2010, the State alleged that Lynch was an habitual offender. At Lynch's jury trial, the court admitted into evidence State's Exhibit 41, which was a Certificate of Analysis prepared by the Indiana State Police Laboratory Division on September 17, 2010. The Analysis indicated in part that Item 3E was a "[s]ealed manila envelope containing the buccal swab standard of [] Lynch," that Item 4A was a "[s]ealed manila envelope containing one area taken from the washcloth," that Item 5A was a "[s]ealed manila envelope containing the crotch area taken from the underwear" of L.W., that "[s]eminal material and amylase were detected on one area of the washcloth contained in item 4 (sample retained within item 4A)," that "[t]he DNA profiles obtained from the sperm fractions of one sample from the washcloth (item 4A) and two cuttings from the crotch area of the underwear (item 5A) match the DNA profile of [] Lynch (item

5

3E)," and that "[i]n the absence of an identical twin, [] Lynch is the source of the DNA to a reasonable degree of scientific certainty." State's Exhibit 41 at 1-3. The court also admitted into evidence State's Exhibit 42 containing a partially redacted version of Lynch's September 23, 2010 police interview. Lynch requested the court to give the jury an instruction on the *mens rea* requirement of the charged offense, and the court denied the request.

The jury found Lynch guilty of child molesting as a class A felony as charged. Lynch then pled guilty to being an habitual offender. The court sentenced Lynch to forty years for child molesting as a class A felony and enhanced the sentence by thirty years for being an habitual offender for an aggregate sentence of seventy years.

I.

The first issue is whether the court's failure to give a *mens rea* jury instruction requires reversal. Lynch maintains that the court committed reversible error in failing to provide the jury with an instruction on the *mens rea* requirement of the offense of child molesting as a class A felony. The State argues that any error in the trial court's instructions concerning the offense of child molesting was harmless.

Generally, "[t]he purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." Overstreet v. State, 783 N.E.2d 1140, 1163 (Ind. 2003), cert. denied, 540 U.S. 1150, 124 S. Ct. 1145 (2004). The manner of instructing a jury lies largely within the discretion of the trial court, and we will reverse only for abuse of discretion. Henson v. State, 786 N.E.2d 274, 277 (Ind. 2003).

6

An error is to be disregarded as harmless unless it affects the substantial rights of a party. Oatts v. State, 899 N.E.2d 714, 727 (Ind. Ct. App. 2009); Ind. Trial Rule 61. "Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise." Dill v. State, 741 N.E.2d 1230, 1233 (Ind. 2001).

Here, even if we assume that the trial court abused its discretion in declining to give a specific instruction on the *mens rea* requirement of a child molesting offense, we conclude that any error was harmless.[2] A defendant must demonstrate that his substantial rights have been prejudiced in order to obtain a reversal for the trial court's failure to instruct the jury. Cliver v. State, 666 N.E.2d 59, 67 (Ind. 1996), reh'g denied; Ind. Trial Rule 61. The jury was instructed that the State was required to prove each element of the charged crimes beyond a reasonable doubt, that a person charged with a crime is presumed to be innocent, that a defendant must not be convicted on suspicion or speculation, and that the jury had the duty to determine the value to give the testimony. In addition to the DNA test results, the police interview, and other evidence, the State presented testimony that the injuries to L.W.'s anus were not consistent with spanking, were not consistent with the child having constipation or a bowel movement, and were not consistent with a typical accidental fall, and the jury was able to weigh and judge the credibility of the evidence. The jury could have returned a verdict in Lynch's favor based upon the instructions that were given. The trial court's failure to give a *mens rea* jury

_____

[2] We note that the culpability required for a child molestation conviction is "knowingly or intentionally." See Medina v. State, 828 N.E.2d 427, 430 (Ind. Ct. App. 2005) (some citations omitted and citing in part State v. Keihn, 542 N.E.2d 963, 967-968 (Ind. 1989) (where the legislature fails to specify a level of mental culpability with respect to an offense, a level of mental culpability of knowingly will be presumed to be required)), affirmed on reh'g, trans. denied.

instruction under the circumstances did not prejudice Lynch's substantial rights and was harmless beyond a reasonable doubt. See Medina v. State, 828 N.E.2d 427, 431 (Ind. Ct. App. 2005) (noting that, because it is impossible for a person to accidentally commit the acts committed by the defendant, the defendant would not challenge his *mens rea* on remand but would again deny the commission of the acts underlying his offense, observing that remanding would merely allow the defendant to present the same defense already rejected by a jury, and holding that the trial court's failure to give a *mens rea* jury instruction was harmless beyond a reasonable doubt), affirmed on reh'g, trans. denied. Accordingly, reversal on this basis is unwarranted.

## II.

The next issue is whether the court abused its discretion in admitting statements Lynch provided during the September 23, 2010 police interview. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001). "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." Fleener v. State, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted).

Lynch contends that the court erred in admitting his interview statements to police because the statements were not voluntarily given as the "officers used trickery and deceit in order to obtain it." Appellant's Brief at 13. Lynch also argues that he suffered

8

from emotional issues and was in the low range of intellectual functioning. The State maintains that the court properly admitted Lynch's statement, that the interview lasted less than two hours, the officers were polite, Lynch had prior experience in the criminal justice system, and that any trickery or deceit on the part of the officers did not render Lynch's statement involuntary.

In addition to the required Miranda advisement, a defendant's self-incriminating statement must also be voluntarily given. Crain v. State, 736 N.E.2d 1223, 1230 (Ind. 2000). To be voluntary, a defendant's statements must not have been induced by violence, threats, promises, or other improper influence. Faris v. State, 901 N.E.2d 1123, 1127 (Ind. Ct. App. 2009), trans. denied. A defendant's mental state is not enough to render a confession inadmissible in the absence of coercive police activity. Id. (citing Smith v. State, 689 N.E.2d 1238, 1248 (Ind. 1997)). "In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including: the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Pruitt v. State, 834 N.E.2d 90, 115 (Ind. 2005) (citations and internal quotation marks omitted), reh'g denied, cert. denied, 548 U.S. 910, 126 S. Ct. 2936 (2006). On appeal, we do not reweigh the evidence but instead examine the record for substantial, probative evidence of voluntariness. Id. We examine the evidence most favorable to the State, together with the reasonable inferences that can be drawn therefrom. Id. If there is substantial evidence to support the trial court's conclusion, it will not be set aside. Id. A defendant must show specific instances where his impaired

9

abilities have an effect on voluntariness in order to prevail on a claim that his mental condition prevented him from knowingly waiving his Miranda rights. Id. (citations omitted). Although a person's mental condition is relevant to the issue of susceptibility to police coercion, where the person voluntarily makes a confession without police coercion the confession may be considered in spite of the mental condition. Pettiford v. State, 619 N.E.2d 925, 928 (Ind. 1993).

In this case, other than the fact that the detectives gave Lynch a false reason to accompany them to the police station for the interview, namely, that they needed to talk to Lynch about Copley's upcoming trial, Lynch does not point to and our review does not reveal evidence that the detectives further lied or provided false information to Lynch during the interview. Further, Lynch does not point to specific instances where his impaired abilities may have had an effect on the voluntariness of his statements during the police interview. Review of the interview admitted into evidence indicates that it lasted less than two hours, the detectives were professional, Lynch was given a drink and a cigarette break after approximately one hour, and the police questioning which elicited Lynch's responses and statements that he inserted his penis into L.W.'s anus was not deceptive or otherwise improper so as to render Lynch's statements involuntary.

Under the totality of the circumstances, we conclude based upon the record that Lynch has failed to demonstrate that his statement was induced by violence, threats, or other improper influences that overcame his free will or that the police conduct in relation to the specific subject was overbearing. See Crain, 736 N.E.2d at 1231 (finding no evidence of violence, threats, promises, or improper influence regarding the defendant's

10

confession); <u>Light v. State</u>, 547 N.E.2d 1073, 1079 (Ind. 1989) (holding that evidence substantially supported the trial court's determination that the defendant's statement was voluntary where the defendant alleged mental slowness and there was testimony that he could not read or write, the custodial interrogation lasted four hours, and where police acknowledged lying to the defendant), <u>reh'g</u> <u>denied</u>; <u>Faris</u>, 901 N.E.2d at 1127 (holding that the defendant's statement was voluntarily given under the circumstances including the length of the interrogation and the officers' testimony regarding the defendant's demeanor and manner of speaking).

III.

The next issue is whether Lynch's sentence for child molesting as a class A felony is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. <u>Childress v. State</u>, 848 N.E.2d 1073, 1080 (Ind. 2006).

Lynch contends that the sentence imposed was inappropriate given his mental health issues, his borderline mental functioning, and the fact that he was repeatedly molested as a youth. Lynch points to a report of a forensic psychologist that indicated that Lynch functioned in the low average range of intelligence and that he suffered from ongoing post-traumatic stress disorder stemming from his history of sexual abuse. Lynch argues that his habitual offender enhancement was based on the commission of three

11

thefts and requests this court to impose a sentence at or below the advisory level for his child molesting conviction which of necessity must be enhanced by thirty years for the determination that he was an habitual offender. The State argues that Lynch's sentence of forty years for his molesting conviction was ten years above the advisory, that Lynch has prior convictions and previously violated probation on multiple occasions, that he allowed an innocent man to sit in jail for months for a crime that Lynch committed, that Lynch abused his position of trust with the victim, and that the victim suffered traumatic physical injuries.

Our review of the nature of the offense reveals that on October 9, 2009, Lynch babysat L.W., who was his nephew, while L.W.'s mother took Lynch's wife Rachel to a follow up doctor's appointment in connection with Rachel's recent delivery of Lynch and Rachel's twin children. While caring for L.W., Lynch placed L.W. facedown on the sink in the bathroom, unzipped his pants, and inserted his penis into L.W.'s anus. L.W. suffered lacerations and bruising of his anus and bled profusely. Seminal material from Lynch was found on the crotch of L.W.'s underwear and the washcloth Lynch used to wipe L.W. In addition, Lynch allowed Copley to remain incarcerated awaiting trial for the molesting of L.W. until Lynch was interviewed following the DNA testing.

Our review of the character of the offender reveals that, according to the presentence investigation report, Lynch's criminal history includes convictions for theft as a class A misdemeanor and public intoxication as a class B misdemeanor in 2005; battery of a law enforcement officer as a class A misdemeanor in 2006; criminal conversion as a class A misdemeanor in 2007; three counts of theft as class D felonies

12

and battery on a law enforcement officer and trespass as class A misdemeanors in 2008; and domestic battery as a class D felony in 2010. Lynch also violated his probation on several occasions.

After due consideration, we conclude that Lynch has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

For the foregoing reasons, we affirm Lynch's conviction and sentence for child molesting as a class A felony.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.